William D. EDWARDS, Appellant/Cross-appellee,

v.

JEWISH HOSPITAL OF ST. LOUIS, Appellee/Cross-appellant.

Nos. 86–2494, 86–2495.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 11, 1987.

Decided Sept. 2, 1988.

Rehearing and Rehearing En Banc Denied Nov. 15, 1988.

Doris Gregory Black, St. Louis, Mo., for appellant/cross-appellee.

Harold E. Elbert, St. Louis, Mo., for appellee/cross-appellant.

Before McMILLIAN, ARNOLD and BOWMAN, Circuit Judges.

McMILLIAN, Circuit Judge.

Appellant/cross-appellee William D. Edwards appeals from a final judgment entered in the District Court[1] for the Eastern District of Missouri entered on a jury verdict in his favor on his claim of racial discrimination under 42 U.S.C. § 1981 against appellee/cross-appellant Jewish Hospital of St. Louis (Jewish Hospital). For reversal, Edwards argues that the trial court erred in (1) disallowing a $5,000 award of back pay, (2) reducing a $50,000 compensatory damages award to $1 in nominal damages, and (3) giving a special interrogatory on the "same decision" defense. On cross-appeal, Jewish Hospital argues that the trial court erred in (1) denying its motion for judgment notwithstanding the verdict (j.n.o.v.) and (2) refusing to reduce the $25,000 punitive damages award.

I

This case arose from the theft of money deposited by a Jewish Hospital patient in the hospital safe. An investigation of the theft indicated that thirteen Jewish Hospital employees had access to the stolen funds. Edwards was a hospital security guard; he is black. All thirteen employees, including Edwards, were requested to submit to a polygraph examination. One employee refused and was subsequently discharged. Three other employees, including Edwards, failed the test. Edwards was subsequently re-examined twice and failed both times. There was evidence that he was under extreme emotional stress due to family difficulties at the time.

The evidence also showed that both before and after the theft at issue there had been other thefts of money—one in October 1979 and another after Edwards' discharge. Several hospital security officers, including Edwards, were given polygraph examinations on the first occasion, but no one was disciplined. On the occasion after Edwards' discharge, several white security officers took the polygraph examination and showed deception in their answers, but none was fired. At the time of the theft at issue here, Edwards was not at work when the money was reported missing. In fact, Edwards was on leave from the evening the patient deposited the money until after the money was reported missing.

Jewish Hospital fired Edwards for failing the three polygraph examinations. Edwards grieved his discharge through the hospital grievance procedure. The grievance committee resolved Edwards' grievance on the polygraph issue against Jewish Hospital. Nevertheless, after the grievance committee found in Edwards' favor, a hospital administrator, who was not a grievance committee member, informed the grievance committee that Edwards had allegedly threatened two subordinates. In response to this report, the grievance committee, contrary to its own procedures and rules, initiated its own charges on the alleged threats. Before a hearing on the threats could be held, it became obvious that even though three people were said to have been present when the threats were

1. The Honorable David D. Noce, United States Magistrate for the Eastern District of Missouri. This case was tried by a magistrate by the consent of the parties pursuant to 28 U.S.C. § 636(c)(3).

made, not one of the three supported the allegations. There was evidence that Edwards' supervisor told one of these witnesses that he should be for the Hospital and told another witness who appeared to testify at the second hearing to leave.

During the hearing on the alleged threats, the grievance committee did not hear testimony from either the persons alleged to have been threatened or the persons alleged to have been present when the threats were made. During the hearing, however, Edwards was loud, irate, angry, and abusive. Because of his behavior before the grievance committee, and the fact that as a security officer he carried a gun, the grievance committee upheld the charges and terminated Edwards for making threats and for conduct unbecoming a security officer. Thereafter, Edwards filed this 42 U.S.C. § 1981 suit against Jewish Hospital alleging that he had been discharged on the basis of his race and seeking damages and back pay. At trial, there was evidence that the language used by the hospital security employees in the work place was robust; conduct among non-medical employees was disruptive and loud, and disturbances were frequent. There was also evidence that cursing, racial name-calling and the telling of derogatory racial jokes were not only engaged in regularly by the hospital security staff but also well known to Jewish Hospital. No one was ever disciplined for any of this misconduct.

In answer to two separate special interrogatories submitted to the jury at the conclusion of the trial, the jury found that (1) Jewish Hospital had intentionally discriminated against Edwards on the basis of race when it terminated him in that race was a *substantial* and *motivating* factor in its decision to discharge him; and (2) Jewish Hospital would have terminated Edwards even if his race had not been a substantial and motivating factor. The jury awarded Edwards $50,000 in compensatory damages, $5,000 back pay and $25,-

000 in punitive damages. On Jewish Hospital's motion to amend the judgment pursuant to Fed.R.Civ.P. 59(e), the trial court reduced the compensatory damages award to $1 nominal damages, struck the $5,000 back pay award, and affirmed the punitive damages award. Edwards' motion to reinstate the original judgment and Jewish Hospital's motion for j.n.o.v. were both denied. This appeal and cross-appeal followed.

II

We take up Jewish Hospital's cross-appeal first. Jewish Hospital first argues that the trial court erred in denying its motion for j.n.o.v. Jewish Hospital argues that the jury's finding that, even in the absence of the intentional discrimination, it would have made the "same decision" exonerated it from all liability to Edwards.

■ The question presented by this argument is whether § 1981 prohibits an employer from intentionally discriminating against a Black employee on the basis of his race by discharging him where a substantial and motivating factor in the discharge is the employee's race. We hold that it does, even if the employer would have discharged the employee in the absence of intentional racial discrimination. We will not allow an employer to avoid liability for intentional racial discrimination where the discrimination is a substantial and motivating factor in causing injury, even if the discrimination is not a "but for" cause of the employee's discharge. Rather, evidence that the employer would have discharged the employee in the absence of discrimination is properly considered in determining the appropriate remedy to be afforded the employee.

The starting point in our analysis is the legislative history to § 1981. Congress originally enacted § 1981 as part of § 1 of the Civil Rights Act of 1866,[2] pursuant to § 2 of the thirteenth amendment. Interpreting the legislative history of § 1 of the 1866 Act, from which both 42 U.S.C.

**2.** Congress reenacted § 1 of the 1866 Act in the Enforcement Act of 1870, ch. 114, 16 Stat. 140. Section 1 was codified in §§ 1977 and 1978 of the Revised Statutes of 1874, which are now

codified in 42 U.S.C. §§ 1981 and 1982 (1976). *See Runyon v. McCrary,* 427 U.S. 160, 168 n. 8, 96 S.Ct. 2586, 2593–94 n. 8, 49 L.Ed.2d 415 (1976).

§§ 1981 and 1982 are derived, the Supreme Court in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437, 88 S.Ct. 2186, 2202, 20 L.Ed. 2d 1189 (1968) (emphasis added), concluded that Congress intended to prohibit *"all racial discrimination*, private and public, in the sale and rental of property."  The *Jones* Court further concluded that this prohibition was within Congress' power under § 2 of the thirteenth amendment "rationally to determine what are the badges and incidents of slavery, and ... to translate that determination into effective legislation." *Id.* at 440, 88 S.Ct. at 2203.  Seven years later the Court unanimously held that "§ 1981 affords a federal remedy against discrimination in private employment on the basis of race." *Johnson v. Railway Express Agency*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975).

The Court has recognized that in enacting the 1866 Act, Congress took aim at *discrimination* in employment, from whatever source.  Discrimination must be eliminated if the "badges and incidents" of slavery are to be fully eradicated, particularly within the context of employment:

> Racial discrimination in all areas, and particularly in the areas of education and employment, is a devastating and reprehensible policy that must be vigilantly pursued and eliminated from our society:
>
>> Racial discrimination can be the most virulent of strains that infect a society and the illness in any society so affected can be quantified.  Exposure to embarrassment, humiliation, and the denial of basic respect can and do cause psychological and physiological trauma to its victims.  The disease must be recognized and vigorously eliminated wherever it occurs.  But racial discrimination takes its most malevolent form when it occurs in employment, for prejudice here not only has an immediate economic effect, it has a fulminating integrant that perpetuates the pestilences of degraded housing, unsatisfactory neighborhood amenities, and unequal education.

*General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 413, 102 S.Ct. 3141, 3161–62, 73 L.Ed.2d 835 (1982) (Marshall, J., dissenting) (quoting *Croker v. Boeing Co.*, 662 F.2d 975, 1002 (3d Cir. 1981) (Aldisert, J., dissenting in part)).

Nothing in the legislative history to § 1981 or in the decisions of the Supreme Court indicates that the peculiar form of racial employment discrimination which does not constitute the "but for" cause of an adverse employment decision is removed from the purview of the statute.  Accordingly, we hold that where an employee demonstrates by a preponderance of the evidence that race was a substantial or motivating factor in his or her discharge, liability under § 1981 is established.

■ The remedy afforded a successful § 1981 plaintiff who would have been discharged even in the absence of racial discrimination, however, is a different matter.  An employer may avoid reinstatement or an award of back pay or both by demonstrating by a preponderance of the evidence that the employee would have been discharged even if race had not been a motivating factor in the decision.  This rule prevents an employee from being placed in a better position as a result of his race than he would otherwise occupy.

Our analysis finds support in the Supreme Court's treatment of procedural due process and in this circuit's decisions concerning Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e to 2000e–17.  In *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Court held that a violation of procedural due process may occur even in the absence of actual injury, although the remedy for the violation must be fashioned to avoid a windfall:

> Common-law courts traditionally have vindicated deprivations of certain "absolute" rights that are not shown to have caused actual injury through the award of a nominal sum of money.  By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those

rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights.

Because the right to procedural due process is "absolute" in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.

*Id.* at 266, 98 S.Ct. at 1053–54. (citations omitted). We believe it cannot be seriously disputed that the right to be free from intentional racial employment discrimination is absolute in the same sense. This much is implicit in the one hundred and twenty-two years of American social history since the decision was made to eliminate slavery and the badges and incidents thereof.

In *Bibbs v. Block,* 778 F.2d 1318 (8th Cir.1985) (en banc), this court took an even stronger position with respect to racial employment discrimination under Title VII. In *Bibbs,* we held that where race is a "discernible" factor in an adverse employment decision, liability under the statute is established. "Every kind of disadvantage resulting from racial prejudice in the employment setting is outlawed. Forcing Bibbs to be considered for promotion in a process in which race plays a discernible part is itself a violation of the law, regardless of the outcome of the process." *Id.* at 1322. We further concluded that the employer "may avoid an award of reinstatement or promotion and back pay if it can prove by a preponderance of the evidence that the plaintiff would not have been hired or promoted even in the absence of the proven discrimination." *Id.* at 1324 (footnote omitted). *See also Fadhl v. City of San Francisco,* 741 F.2d 1163, 1166 (9th Cir.1984) (where Title VII plaintiff shows unlawful motive was a significant factor, liability is established; defendant may limit

relief by demonstrating decision would have been the same absent discrimination).

We need not reach the question of whether the *Bibbs* "discernible factor" "mixed motive" analysis applies to actions under § 1981. This case does not present a "discernible factor" "mixed-motive" discharge. Here, Edwards' race was in fact a substantial or motivating reason for his discharge. *See Bibbs,* 778 F.2d at 1330–32 (Ross, J., dissenting). We will, however, apply the remedial analysis in *Bibbs* prohibiting an employee from being awarded reinstatement or back pay where the discharge decision would have been the same in the absence of the proven motivating racial discrimination.

■ Jewish Hospital, however, argues that under *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1976) (*Mt. Healthy* ), a verdict must be directed for the employer where the jury finds that even though race was a substantial factor in the discharge decision, the employer would have made the same decision based upon legitimate, non-discriminatory reasons. In *Mt. Healthy,* a school teacher alleged that the school district had discharged him because he had exercised his first amendment rights. In vacating a judgment for the plaintiff, the Court held that proof that his constitutionally protected activity was a "substantial" or "motivating" factor in the plaintiff's discharge did not end the inquiry. The Court held that if the school board could establish that it would have made the same decision even in the absence of the protected conduct, there would be no constitutional violation "justifying remedial action." *Id.* at 285, 97 S.Ct. at 575. The Court reasoned that reinstatement would be inappropriate because "[t]he constitutional principle at stake is sufficiently vindicated if such employee is placed in no worse position than if he [or she] had not engaged in the [protected] conduct." *Id.* at 285–86, 97 S.Ct. at 575. The Court therefore remanded the case to the district court for a determination of whether the school board would have discharged the plaintiff

even in the absence of the protected conduct.

Although *Mt. Healthy* clearly held that a plaintiff could not be reinstated where the same discharge decision would have been made, it is not clear that the Court held that this "same decision" defense precluded liability. *See* Wolly, *What Hath* Mt. Healthy *Wrought?*, 41 Ohio St.L.J. 385, 390–94 (1980). In any event, *Mt. Healthy* did not address the proper analysis for a "same decision" case brought under § 1981.

In *Hervey v. City of Little Rock*, 787 F.2d 1223 (8th Cir.1986) (*Hervey*), this court recently applied *Mt. Healthy* to a sex discrimination charge filed under 42 U.S.C. § 1983 and the equal protection clause of the fourteenth amendment. Under these circumstances, the *Hervey* court held that the *Mt. Healthy* "same decision" analysis governed:

> Robinson is therefore limited to proving that the City violated her equal protection rights under the fourteenth amendment in order to recover under § 1983. In this "mixed-motive" situation, she must show that a sexually discriminating purpose was a motivating factor in the City's promotional decision. If the City then fails to carry the burden of establishing that the same decision would have been made absent the discriminating motive, an equal protection violation is established.

*Id.* at 1233 (citations and footnotes omitted). Implicit in *Hervey* is the conclusion that for § 1983 purposes the *Mt. Healthy* analysis goes to liability rather than merely remedy.

Jewish Hospital argues that because we have applied the *Mt. Healthy* analysis to actions brought under the fourteenth amendment and § 1983, we should also apply it to § 1981 cases because of the common fourteenth amendment roots of § 1981 and § 1983. In *General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 389–90, 102 S.Ct. 3141, 3149, 73 L.Ed.2d 835 (1982), relied upon by Jewish Hospital, the Court noted that the origin of § 1981

can be traced to both the Civil Rights Act of 1866 and the Enforcement Act of 1870. Both of these laws, in turn, were legislative cousins of the Fourteenth Amendment.... In light of the close connection between these Acts and the Amendment, it would be incongruous to construe the principal object of their successors, § 1981, in a manner markedly different from that of the Amendment itself.

Jewish Hospital argues that because cases involving § 1981's "legislative cousins," the fourteenth amendment and § 1983, are controlled by the *Mt. Healthy* "same decision" formulation, we should follow the same analysis in § 1981 cases. We disagree. *General Building* decided that § 1981, like the fourteenth amendment, can be violated only by intentional discrimination. It also eliminated from § 1981's sphere of liability those cases that have a disparate impact upon racial minorities unless that impact can be traced to discriminatory purpose. But the question whether intentional racial employment discrimination is actionable under § 1981 where the discrimination is not the "but for" cause of discharge is quite different from the issue presented in *General Building*. Here, the jury specifically found that Edwards was the victim of intentional discrimination; the problem addressed in *General Building* is not present in this case. What is presented here is whether the *Mt. Healthy* analysis used in § 1983 cases should be applied to § 1981 claims. Based on the legislative history and purposes of § 1981 set forth above, we have concluded that it should not.

The *Mt. Healthy* "same decision" analysis rests on the assumption that the only goal is to compensate victims of civil rights violations. Regardless of the validity of this assumption when applied to the array of civil rights violations cognizable under § 1983, we believe the assumption should not apply to § 1981 cases in which an employer has been found to have intentionally discriminated on the basis of race. The deterrent purposes which also underlie § 1981 would be thwarted in many cases if an employer were able to avoid liability

completely by showing that his intentional racial discrimination happened in this particular instance to be "harmless."[3] The *Mt. Healthy* "same decision" analysis is quite unlikely to provide the "spur or catalyst which causes employers ... to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges" of their racially discriminatory practices. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–18, 95 S.Ct. 2362, 2371–72, 45 L.Ed.2d 280 (1975) (quoting *United States v. N.L. Industries, Inc.*, 479 F.2d 354, 379 (8th Cir.1973)).

The legislative history behind § 1981 and the national policy of blotting out all vestiges of racial discrimination, especially in employment, as evidenced by both § 1981 and Title VII, compel us to reject Jewish Hospital's argument to apply the *Mt. Healthy* analysis to § 1981 employment discrimination cases. The trial court properly denied Jewish Hospital's motion for j.n.o.v.

■ Jewish Hospital next argues that the trial court erred in denying its motion to reduce the punitive damages award to reflect the reduction in actual damages from $50,000 to $1 nominal damages. We note that Jewish Hospital does not attack the legal basis for the allowance of punitive damages. Jewish Hospital's argument is that the amount of punitive damages awarded must bear a reasonable relationship to the amount of compensatory damages awarded. While we do not disagree with this observation and have so held on many occasions, *see, e.g., Hollins v. Powell*, 773 F.2d 191, 198 (8th Cir.1985) (punitive damages award must bear a reasonable

relationship to injury); *Ogilvie v. Fotomat Corp.*, 641 F.2d 581, 586 (8th Cir.1981) ("irrational" award reduced because no rational relationship between award and injury shown), such a general statement has no application to an award of nominal damages. To apply the proportionality rule to a nominal damages award would invalidate most punitive damages awards because only very low punitive damages awards could be said to bear a reasonable relationship to the amount of a nominal damages award. Consequently, in those cases where the trial court has awarded nominal damages and punitive damages, we rely and give great deference to the trial court's discretion as to the amount of the punitive damages award it has permitted to stand. We will only reverse or modify those allowances where it has been demonstrated that the court has abused its discretion. On the basis of the record and the jury's finding of intentional discrimination, we hold that the trial court did not abuse its discretion in denying the motion to reduce the punitive damages award.

### III

■ Next we consider Edwards' allegations of error. First, we find no merit to Edwards' argument that the trial court erred in striking the $5,000 back pay award. Here, the jury found that even in the absence of intentional discrimination, Jewish Hospital would have discharged Edwards anyway. Under these circumstances, backpay would be a windfall to Edwards, even though he was the victim of intentional racial discrimination.

■ We similarly find no merit in Edwards' argument that the trial court erred

---

**3.** Indeed this may be the result in a great number of cases. One commentator has noted that

> [d]espite the fact that the *Mt. Healthy* standard places the burden of establishing the "harmless" nature of the discrimination on the employer, the plaintiff in many meritorious cases is likely to face the very difficult task of refuting the defendant's showing. It has been observed that "plausible justification [for adverse personnel action] can frequently be advanced whether or not it actually played any part in the formulation of the decision under contest," and that employers "who re-

ceive adequate legal advice and know how to create a personnel file ... will find rare the occasions on which they are found liable."

Brodin, *The Standard of Causation in the Mixed–Motive Title VII Action: A Social Policy Perspective*, 82 Colum.L.Rev. 292, 321 (1982) (quoting Christensen & Svanoe, *Motive & Intent in the Commission of Unfair Labor Practices: The Supreme Court & the Fictive Formality*, 77 Yale L.J. 1269, 1322 (1968), and Tushnet, *Truth, Justice, & the American Way: An Interpretation of Public Law Scholarship in the Seventies*, 57 Tex.L.Rev. 1307, 1355 (1979)).

in reducing the $50,000 compensatory damages award to $1. While compensatory damages are recoverable under § 1981, the damages recovered must be directly caused by the defendant's wrongful act. Here, Edwards alleged that his discharge caused him mental distress and suffering as the basis for his compensatory damages. Jewish Hospital's discrimination, however, was not the legal cause of Edwards' discharge because he would have been discharged anyway. As a result, Edwards' mental distress cannot be traced to Jewish Hospital's wrongful act, and the trial court properly reduced the compensatory damages award to $1.00 nominal damages.

■ Third, we find no merit in Edwards' argument that the trial court erred in submitting special interrogatory No. 3, the "same decision" test, because it was not supported by substantial evidence. Edwards has failed to preserve this allegation of error for review. Our search of the record finds no motion for j.n.o.v. pursuant to Fed.R.Civ.P. 50(b). *Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446, 1453 (Fed.Cir.1984) (party should have filed a Rule 50(b) motion for j.n.o.v. since it wished to challenge sufficiency of evidence supporting particular findings of the jury), *cert. denied*, 471 U.S. 1136, 105 S.Ct. 2676, 86 L.Ed.2d 694 (1985).

■ Edwards' final argument that special interrogatory No. 3 was misinterpreted by the jury also is not preserved for review. *See* Fed.R.Civ.P. 51 (party must object and give grounds before jury retires). Edwards neither objected to nor assigned any reasons as to the invalidity of interrogatory No. 3; hence, these objections are waived.

Accordingly, the judgment of the district court is affirmed.